IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JAMES ROBERT JOSEPH CHENEY, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 05-1826-TC |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MICHAEL WASHINGTON, | ) | |
| Chairman of the Oregon | ) | |
| Board of Parole and Post | ) | |
| Prison Supervision, | ) | |
| | ) | |
| Respondent. | ) | |

COFFIN, Magistrate Judge.

Before the court is petitioner's Petition for Writ of Habeas Corpus (#1). For the reasons that follow, the court should grant the writ.

BACKGROUND

In this habeas action, petitioner challenges his 1999 convictions for first-degree sexual abuse. The record discloses the following facts leading up to the conviction. Petitioner was acquainted with Tina, the mother of T.D., the ten-year-old female complainant and Tina's boyfriend (Martin), and he spent time socializing at their residence. Pet. Ex. 3, Tr. 332. 777, 993. During a snow day when T.D. and her brother stayed home from school, petitioner came to their house looking for Martin, who was not home. Pet. Ex. 3, Tr. 326, 428, 431. According to petitioner's testimony, petitioner took T.D. to her

bedroom after she claimed that petitioner's hat was there. Pet. Ex. 3, Tr. 1000-01. T.D.'s brother testified that he observed, through a crack in the door connecting the room to a bathroom, petitioner kissing T.D. and attempting to put his tongue inside her mouth. Tr 449. T.D.'s brother called their grandparents, who took the children and contacted Tina. Pet. Ex. 3, Tr. 449. Tina told petitioner to leave the house and contacted police. Pet. Ex. 3, Tr. 1002. Deputy Troxel and a state case worker from Services for Children and Families interviewed the children that evening. Pet. Ex. 3, Tr. 545. Petitioner was charged with four counts of first-degree sexual abuse against T.D., which included their contact on the "snow day." Pet. Ex. 3, Tr. 545.

In the state's case-in-chief, T.D. testified at trial about three instances in which petitioner had touched her sexually, which included the snow day incident. Pet. Ex. 3, Tr. 336, 350, 370. The jury was shown T.D.'s videotaped interview with the state case worker, which related information similar to T.D.'s trial testimony. T.D.'s brother testified to what he witnessed through the crack in the door on the snow day. Pet. Ex. 3, Tr. 449. Martin and another witness, Jenkins, testified that another person, Murs, had advised them around the same time as the snow day that petitioner should not be left alone with children. Pet. Ex. 3, Tr. 715, 784-85.

The defense countered by challenging T.D.'s credibility. Three expert witnesses, including petitioner's sister-in-law (Sikich), testified to improper influences to T.D. and their effects on her

ability to reliably recount petitioner's actions.   Pet. Ex. 3, Tr. 814, 946-88, 1064.

Detective Troxel was called as a defense witness.   On cross-examination, he was asked whether he recommended prosecution in cases where a complainant's allegations were unfounded.  He responded, "If, based on the information I received, I believed that no crime had been committed, I would not -- I would write up my findings and send it to the D.A.'s office, but not recommend prosecution, no."  Pet. Ex. 3, Tr. 892.

Near the end of trial, the prosecutor made the following statement to the jury in her rebuttal to defense counsel's closing argument:

> Let me tell you about what - what my job is.
>
> My job as a prosecutor - and I've been a defense attorney.  I've been where [defense counsel] is sitting right now.  And the role I have now is very different. I cannot just advocate for whatever my client tells me to say.  And whether it's true or not.  I cannot get up here and say that.  My job, by law, is I - I can only advocate for cases where I believe that it's true, where I believe that it happened.  If I think it's a close case, if I think it's a case I could win, and I still don't feel good about it, I'm required by law not to go through with it.  That's a very different job than Mr. Carter has.  Very different.
>
> And what is the job of the police in this particular case?  What did they tell you?  There are many cases where we do not recommend prosecution. There are many cases that we find unfounded and we don't go ahead with those.  And it is only on true cases that we are required to recommend prosecution.  And that was the testimony of Dwayne Troxel.  Pet. Ex. 3, Tr. 1248.

After the prosecutor's rebuttal and after the court had begun to instruct the jury, defense counsel moved for a mistrial outside the presence of the jury. Pet. Ex. 3, Tr. 1257-59. The court denied the motion but added the following instruction: "Personal beliefs asserted by either counsel in closing arguments as to the truth or falsity of facts is not to be considered by you." Pet. Ex. 3, Tr. 1260.

The jury found petitioner guilty on all four counts. He is now serving four concurrent sentences of 75 months of imprisonment. Pet. Ex. 2.

After trial petitioner's associates averred one of the jurors, Cruz, fell asleep on occasion during the trial. Defense counsel averred that, though his recollection was incomplete, he might have brought the matter to the court's attention. Pet. Ex. 22.

Petitioner sought direct review in the Oregon Court of Appeals and then Oregon Supreme Court, asserting that the trial court erred in denying (1) petitioner's motion for mistrial based on the prosecutor's closing argument, and (2) petitioner's motion for a new trial on the basis of juror misconduct. The Oregon Court of Appeals affirmed, and the Oregon Supreme Court denied review. Pet. Ex. 6, 8.

Petitioner timely sought post-conviction relief, asserting that defense counsel was constitutionally inadequate in certain respects, including: (1) failing to present tactically essential expert testimony regarding the circumstances of T.D.'s accusations against him; (2) failing timely to move for a mistrial during the prosecutor's rebuttal; (3) failing to bring the juror's inattention to the court's

attention; and (4) failing to object to the suggestion of Martin and Jenkins that a nontestifying acquaintance, Murs, indicated to them that petitioner should not be left alone with T.D. and her brother. The post-conviction court ruled against petitioner on all counts. Pet. Ex. 11.    Petitioner timely appealed to the Oregon Court of Appeals, which affirmed the post-conviction judgment.    Pet. Ex. 24. The Oregon Supreme Court denied review.    Pet. Ex. 29.

In this habeas action, petitioner renews the four post-conviction claims described above.    For the reasons that follow, I recommend that the district court grant petitioner's request for a writ of habeas corpus.

ANALYSIS

<u>Legal Standard</u>

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant habeas relief regarding any claim "adjudicated on the merits" in a state court unless the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).    The Supreme Court has explained that a state court decision is "contrary to" federal law under the AEDPA if it either fails to apply the correct Supreme Court authority or applies the correct controlling authority to a case involving "materially indistinguishable" facts but reaches a different result. <u>Williams v. Taylor</u>, 529 U.S. 362, 405-07, 413 (2000).    Similarly, a state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from

5 - FINDINGS AND RECOMMENDATION

[the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citations omitted).

"In Williams and in subsequent decisions the Supreme Court has repeatedly emphasized that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003) (quoting Williams, 529 U.S. at 410). Thus, "[t]he petitioner must demonstrate not only that the state court's application of governing federal law was erroneous, but also that it was objectively unreasonable." Ramirez v. Castro, 365 F.3d 755, 762 (2004) (citing Andrade, 538 U.S. at 75); see also Penry v. Johnson, 532 U.S. 782, 793 (2001); Clark, 331 F.3d at 1068-69 (discussing Andrade and the appropriate standard of review).

In ineffective assistance of counsel cases, the federal law in question is the Strickland standard, which states that a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). Thus, the task of the habeas court is to consider whether the post-conviction court implemented an unreasonable application of Strickland when it determined that petitioner was not denied effective assistance of counsel.

Petitioner bears the burden of proving, by a preponderance of the evidence, the underlying facts supporting the ineffective assistance of counsel claim. See ORS 138.620(2). Moreover, 28 U.S.C. § 2254(d)

6 - FINDINGS AND RECOMMENDATION

creates a presumption that state court findings of fact, after a hearing on the merits, are correct.

<u>Application to Petitioner's Claims</u>

(1) Failure to Timely Move for Mistrial

Petitioner contends that his defense counsel provided constitutionally inadequate representation when he failed to move immediately for a mistrial during the prosecutor's closing argument on the basis that the prosecutor impermissibly vouched for the complainant's credibility. In petitioner's view, defense counsel should have raised the objection when the prosecutor began to explain her role to the jury in the quotation excerpted above, which concluded, "And it is only on true cases that we are required to recommend prosecution. And that was the testimony of [Officer] Dwayne Troxel." Troxel indeed testified that he did not recommend prosecution in cases where, in his view, no violation had occurred, and that testimony was permitted without objection.[1] The record

---

[1]Petitioner also asserts that Troxel's statement on cross-examination, in which he explained that where he "believed that no crime had been committed, [he] would not . . . recommend prosecution," was tantamount to vouching for the credibility of the witnesses because the state's case rested largely on whether T.D. and her brother told the truth about petitioner's conduct. Vouching, as petitioner correctly points out, places that prestige of the government behind a witness, an impermissible consideration that may taint the jury's ability to evaluate the witness's veracity. <u>See, e.g.</u>, <u>United States v. Cummings</u>, 468 F.2d 274, 278 (9th Cir. 1972) (representation to jury that indictments are returned only when government attorney's are convinced that a crime was committed creates unfair process). Petitioner contends that defense counsel's failure to object to Troxel's testimony constitutes another instance of ineffective assistance. Because I rest my determination on the prosecutor's use of Troxel's testimony and her own improper vouching, I do not separately consider petitioner's argument on that point.

7 - FINDINGS AND RECOMMENDATION

indicates that defense counsel instead moved for a mistrial after the close of rebuttal.  As noted above, the motion was denied, and the jury was instructed that "[p]ersonal beliefs asserted by either counsel in closing arguments as to the truth or falsity of facts is not to be considered."

The post-conviction court explained that the failure to timely object during closing argument could not form the basis of an ineffective assistance claim:  "[W]hile the statements of the district attorney during closing argument, which the Court of Appeals characterized as 'well beyond the bounds of proper argument,' caused me concern, the Court of Appeals seemed to hold as I find here, that the statements did not affect the outcome of the trial or deny petitioner a fair trial."  Pet. Ex. 22, p. 5.

The issue before the habeas court is not merely the impropriety of the prosecutor's statements, but also whether the untimeliness of defense counsel's objection amounted to constitutionally inadequate representation.  Under the Strickland standard, petitioner is required to demonstrate that counsel's representation fell below an objective standard of reasonableness.  446 U.S. at 687-88.  Petitioner must also demonstrate that, had defense counsel objected during the prosecutor's argument rather than after, there would have been a reasonable possibility of a different trial outcome.  Id.  The record permits that conclusion.  Moreover, as I will explain, to conclude otherwise amounts to an unreasonable application of the Strickland standard, and for that reason, the post-conviction court erred.

As an initial matter, defense counsel's failure to timely object was clearly deficient. "A prosecutor has no business telling the jury his individual impressions of the evidence." United States v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992). Doing so places the prestige of the government behind the state's evidence, frustrating the jury's role as an independent arbiter of credibility. United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980). Where vouching bolsters critical evidence, the possibility of prejudicial effect is amplified. Kerr, 981 F.2d at 1054. This was especially so here, as the case against petitioner rested almost exclusively on the testimony of two children, which presented all the usual credibility challenges of such young witnesses. The prosecutor's argument appealed to the jury to trust her personal belief and the personal belief of the investigating officer that the case was "true," as they both had a duty not to go forward with the prosecution if they did not believe in it. Even worse, the prosecutor informed the jury that she had once been a defense attorney and then proceeded to tell the jury that the role of petitioner's counsel was to advocate for whatever his client wanted, regardless of whether he believed it to be true.

Under Oregon law, preservation of a claim of error required defense counsel to object immediately. See State. v. Walton, 809 P.2d 81, 97 (Or. 1991). Thus, defense counsel's failure to object not only exacerbated the prejudicial effect by permitting the jury to listen without interruption to assertions that the state's evidence was "true," but it also frustrated petitioner's case on direct appeal.

Morever, it is difficult to escape the conclusion that, but for defense counsel's ineffective assistance, the outcome of the trial would have been different.  The trial court's instruction was simply not sufficiently specific to neutralize the overwhelming prejudice attributable to the prosecutor's remarks.  United States v. Combs, 379 F.3d 564, 575 (9th Cir. 2004), provides important guidance.  There, as here, the prosecutor engaged in prejudicial vouching during closing argument.  The court considered whether the use of standard jury instructions reminding the jury of its role in making credibility determinations and of its duty to confine its deliberations to evidence presented at trial sufficed to cure the prosecutorial vouching.  The court held that, without more, those instructions were inadequate, and "a more specifically tailored curative instruction" was required.  379 F.3d at 575.

In this case, like Combs, the trial court relied on an overly generic instruction which could not adequately cure the prosecutorial misconduct.  The trial court stated only that "[p]ersonal beliefs asserted by either counsel in closing arguments as to the truth or falsity of facts is not to be considered."  (Emphasis added.)  The court did not draw the jurors' attention to the impropriety of the prosecutor's representation that she is professionally permitted to bring only meritorious cases, while defense counsel defends clients that counsel knows to have meritless cases.  Nor did the instruction alert the jurors to the impropriety of the prosecutor's representation that the investigating officer, Troxel, referred the case because it was "true."  Because it lacked any specific guidance about the scope

10 - FINDINGS AND RECOMMENDATION

of permissible consideration, the instruction fell far short of addressing the particular misconduct it was intended to cure. See United States v. Weatherspoon, 410 F.3d 1142, 1151 (9th Cir. 2005) ("curative instructions offered did not neutralize the harm of the improper statements because '[t]hey did not mention the specific statements of the prosecutor and were not given immediately after the damage was done'") (quoting Kerr, 981 F.2d at 1054).

Finally, the instruction was not given immediately after the prosecutor began to make the improper argument; rather, jurors were permitted to listen to the entire rebuttal and could not have become aware of the misconduct until they later heard the mild admonition against considering the attorneys' personal beliefs. As a result, the instruction did not alleviate the prejudice. See Kerr, 981 F.2d at 1054 (discussing importance of instructing jury to disregard vouching soon after misconduct occurs).

Because the instruction did not specifically instruct jurors to disregard this egregious overreaching, the jury was equipped to conduct deliberation with an impression that the evidence against petitioner had already survived the filters of both a police department and state attorney's office. Thus, even if the jurors attempted to disregard the "personal beliefs" of the prosecutor, they were not restricted from considering Officer Troxel's understanding of the veracity of the evidence, his practice of declining to refer cases that lack a foundation, and the prosecutor's representation that her official position permits her to represent the state only in cases where evidence indicates a violation of the law occurred. Those

11 - FINDINGS AND RECOMMENDATION

considerations impermissibly placed the weight of government investigative and law enforcement institutions behind the state's evidence. In the context of a case involving child witnesses, this aggravated the prejudicial impact as the prosecutor essentially asked the jury to trust in the judgment of the professionals (her office and the police) who routinely investigate such cases and have the expertise and duty to weed out the untrue.

When jurors are encouraged to understand the role of law enforcement and the prosecutor to be confined to bringing only "true" cases, the jurors are invited to conclude that law enforcement and the prosecutor viewed the children's testimony as necessarily true. See id. at 1054 (prosecutorial vouching has greater prejudice when it addresses witness testimony crucial to government's case). As a result, the jury was encouraged "to give weight to the prosecutor's opinion in assessing the credibility of witnesses, instead of making the independent judgment of credibility to which the defendant is entitled." United States v. McKoy, 771 F.2d 1207, 1211 (9th Cir. 1985).

In sum, the record demonstrates that the uncured misconduct provided the jury with a reservoir of impermissible considerations that likely affected the outcome of the trial; it was unreasonable for the post-conviction court to conclude otherwise. See United States v. Smith, 962 F.2d 923, 934 (9th Cir. 1992) (failure to object to prosecutorial vouching "so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict" and therefore constituted plain error). By concluding that defense

12 - FINDINGS AND RECOMMENDATION

counsel's failure to timely object did not have a reasonable possibility of affecting the trial outcome, the state post-conviction court employed an unreasonable application of the <u>Strickland</u> standard. Habeas corpus relief should be granted on the basis of ineffective assistance of counsel.  If the district court is in agreement with this analysis, the writ will issue on that basis.

However, in the interest of providing the district court with this court's analysis of the remaining of the claims in petitioner's petition, I include them in my findings and recommendation as follows.

(2) Expert Testimony

Petitioner next asserts that the post-conviction court erred in determining that defense counsel "did not fail to present available and tactically essential expert testimony," Pet. Ex. 22, when it chose to call petitioner's sister-in-law, Sikich, as an expert witness concerning the suggestibility of child witnesses.  In petitioner's view, the decision to call Sikich amounted to constitutionally inadequate representation because jurors were unable to accept Sikich as an independent witness.  Because the credibility of the child witnesses was critical to the state's case, petitioner argues, defense counsel should have relied entirely on other experts who would not have presented the same bias problem.

Although jurors may have questioned whether Sikich was biased in petitioner's favor, petitioner has not demonstrated that it was unreasonable for the post-conviction court to conclude that defense counsel's decision had no probable affect on the outcome of the trial.

13 - FINDINGS AND RECOMMENDATION

Sikich, herself a highly credentialed expert, provided testimony that was corroborated by two other experts who testified concerning the same subject, suggestibility of child witnesses.

Moreover, as the state has persuasively argued, the focus of Sikich's testimony rested on the suggestibility of child victims, rather than non-victim witnesses.  Because the testimony of T.D.'s brother, a non-victim witness, figured significantly in the state's case, it is far from clear that, even if the jury discredited Sikich as biased, her testimony affected the outcome of the case.  The post-conviction court's determination does not constitute an unreasonable application of the governing standards.


(3) Inattentive Juror

Petitioner next contends that defense counsel provided constitutionally inadequate representation by failing to call to the trial court's attention a juror who apparently slept during portions of the trial.  Indeed, the alleged juror misconduct came to the court's attention only after trial, through affidavits from supporters of petitioner.  For his part, defense counsel averred that he might have attempted to remedy the problem, but he was not certain.  The post-conviction court did not credit defense counsel's recollection. The relevant facts are set forth in the findings of the post-conviction court, which I reproduce here:

> 7.    Defendant introduced the affidavit of Petitioner's trial attorney (#109).   In it he states, 'Although my recollection is somewhat cloudy about the matter, I do have a memory ...' that one

of the jurors was having difficulty staying awake,
He continues: I am not certain, but I think that
myself, counsel for the state, and Judge Hull
acknowledged the issue in chambers and that after
discussing the situation, Judge Hull decided that he
would watch the gentleman and call for recesses as
it became necessary to insure the attention of the
elderly juror.'   The attorney's uncertainty,
although obviously reflective of his memory, is not
the stuff of proof.  I find that there is no proof
in the record that the attorney brought the matter
to the attention of the judge.

8.   The affidavits introduced by petitioner
state that the juror would 'periodically nod off'
[Richards], 'doze off' [Lyddon & Vaday], generally
'nap . . . through the trial' [Mitchell] and 'one
day' be 'completely asleep' [Mitchell].  All the
affiants are friends or acquaintances of petitioner.
Nevertheless, I find that the juror did occasionally
nod off during the trial.

9.   A defendant is not automatically deprived
of a fair trial if a juror nods off or dozes for
short periods during a trial.   Here, petitioner
argues that the 'juror slept through critical parts
of the trial from the defense perspective' and that
the juror 'was very likely asleep' when the victim
was cross-examined and the petitioner testified
(Petitioner's Trial Memorandum, p. 27).

10.   There was no credible evidence presented
as to exactly when the juror slept or that he was
asleep all the time.  On the other hand, this was a
trial in which petitioner was charged with sexually
abusing a nine-year-old girl on four occasions.  It
is reasonable to conclude, and comports with my
experience as a trial judge, that when a young girl
who was allegedly sexually abused and the man
accused of abusing her testifies, the jurors, no
matter how previously distracted, will be riveted on
the witness and pay close attention to the
testimony.  Petitioner has not proved to the
contrary.

11.   I find that petitioner has failed to prove
that the juror was inattentive during any critical
part of the trial.

> 12.  Petitioner was not denied a fair trial and
> any failure of his attorney to point this out did
> not affect the outcome of the trial.  Pet. Ex. 22.

In this habeas claim, petitioner focuses on finding number 10.  In petitioner's view, the post-conviction court rested his determination on the observation that, in general, "jurors, no matter how previously distracted, will be riveted on the witness and pay close attention to the testimony" when any nine-year-old complainant testifies concerning her own alleged abuse.  In doing so, according to petitioner, the trial court impermissibly relied on a supposition based on experience and failed to reach a conclusion based on facts in the trial court record.

Petitioner's argument disregards the post-conviction court's findings immediately prior to and following the challenged observation.  The post-conviction court found, (1) "There was no credible evidence presented as to exactly when the juror slept or that he was asleep all the time," and (2) "Petitioner has not proved" that the inattentive juror slept during the victim's testimony, which was critical to the case.  Those findings reveal that the post-conviction court based the determination not on his own courtroom experiences, but instead on whether petitioner satisfied his burden of proving, by a preponderance of the evidence, the underlying facts supporting the ineffective assistance of counsel claim.

In order to demonstrate that he was deprived of a fair trial, petitioner was required to show that the juror's inattention deprived him of due process; in other words, he must show that the juror slept

during a critical part of the trial. See United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987) (no deprivation of fair process when juror slept during inconsequential portions of trial). Petitioner did not do so. Though affiants averred that Cruz slept at times during afternoons, there is no certain indication that Cruz was inattentive during any critical witness testimony. The post-conviction court did not employ an unreasonable application of the law in determining that defense counsel's failure to object to the inattentive juror did not qualify as ineffective assistance.

(4) Failure to Object during Testimony of Martin and Jenkins

Finally, I turn to petitioner's contention that the post-conviction court erred in determining that "trial counsel's failure to object to the admission of certain evidence fell below the constitutional standard for effective assistance of counsel." Pet. Ex. 22. Specifically, petitioner asserts that when Martin, and another acquaintance, Jenkins, suggested that a nontestifying acquaintance, Murs, indicated to them that petitioner should not be left alone with children, defense should have objected, and failure to do so warrants habeas relief.

Though lengthy, it is useful to reproduce the challenged testimony here. Jenkins's testimony is as follows:

> Q:  Prosecutor]: * * * Had you been at the Martin and Deitz residence?
>
> A:  [Jenkins]: Yes, I was.
>
> Q:  Okay. And who was there?

A:   I showed up and Tony was there, and I brought my
     son, Jay, and [T.D. and T.D.'s brother] were
     there and then [petitioner] showed up and then
     Tony Murs.

     *  *  *  *  *

Q:   Okay.  And what - what were you all doing?

A:   We were outside, we were talking, and we were
     going to work on - Tony was going to work on his
     snowmobile and then we were all going to work on
     our motorcycles.

     *  *  *  *  *

A:   And I recall at a point [petitioner] wanted to
     use the phone, to go inside and call one of his
     clients.  He was waiting on a check.  He wanted
     to check on that check.

     *  *  *  *  *

Q:   Okay.  And how long was he gone?

A:   Until someone went in to get him.

     *  *  *  *  *

Q:   Okay.  And can you tell us approximately how
     long that was?

A:   Well, I know we were already working on the
     motorcycles, so I'd say 45 minutes to over an
     hour.

Q:   Okay.  And it- who- who else was in the house?

A:   As far as I knew, the kids were there.

Q:   Okay.   You said that Mr. Murs went to look,
     went to get Mr. Cheney?

A:   No, I said- well, actually, yeah, Tony Murs went
     first, but he never went inside.

Q:   Okay.

A:   He came back and said that one of us should go.

Q:    And did he say why he was doing that?

A:    Well prior he did have a comment.

Q:    What did he say?

A:    Well, he asked where [petitioner] was and we
      said he was inside using the phone, and at that
      point, Tony Martin said, "well, go in-"

[Petitioner's trial counsel]: Objection.

[Jenkins]:      "-and get your friend-"

The Court:      Whoa, whoa, whoa.

[Petitioner's trial counsel]: Hearsay.

The Court:      Okay.  Why is it not hearsay * * *?

[Prosecutor]:  It's hearsay.

The Court:      Sustained.

Q [Prosecutor]: Did Mr. Murs explain why it was that
      he went, that he was going to look for - for the
      defendant?

A:    Yes, he did. He -

Q:    What did he say?

A:    He viewed - his - his view was that [petitioner]
      should not be inside alone with the kids.

Q:    All right.

A:    And at that point, I turned to him and I said,
      "what are you talking about" And he said, "No
      adults should be left alone with someone else's
      kids."  And I looked at him and I looked at Tony
      Martin and I said, "what are you talking about?"
      And he said, "That's just general knowledge,
      John.  You don't do that."

      * * * *

A:    He - well, when he was leaving, Tony asked him
      to grab a glass of water when he was inside.
      He ended up coming back with no water and said,

19 - FINDINGS AND RECOMMENDATION

"you guys better go in there.  Go get [petitioner]."  And we said, "What - where is he?"  And he said, "I looked in the window and I saw him laying on the couch."

Q:    Okay.

A:    And he said, so -

Q:    Did he say who was with him on the couch?

A:    No, he just said he was laying on the couch.

Q:    But [T.D.] had been in the house?

A:    Correct.

Pet. Ex. 3, Tr. 712-717.

Petitioner acknowledges that defense counsel objected to the initial statement in which Jenkins attempted to relate what Martin said in response to Murs's question about petitioner's whereabouts.  Petitioner seems to assert, however, that defense counsel should have objected a second time, at the point where Jenkins related that Murs told Jenkins and Martin that the children should not be unattended, that petitioner was on the couch, and that they should go into the house.  In petitioner's view, defense counsel's failure to do so permitted the jury to hear evidence of other "bad acts" that should have been challenged on hearsay and relevancy grounds.

As an initial matter, it is unclear how, if at all, the challenged evidence points to a "bad act" attributable to petitioner.  As the state points out, the challenged testimony relates to an exchange among Murs, Jenkins, and Martin concerning whether petitioner [or anyone else] should be alone in a house

with T.D. and her brother.    That exchange might point to an
inference of impropriety, but it is not clear evidence of actions
that might qualify for exclusion under Oregon Evidence Rule
404(3).[2]

Moreover, out-of-court statements may be offered for purposes
other than the truth of the matter asserted.  Or. R. Evid. 801(3).
Murs's statements were admissible to show circumstantially Murs's
own state of mind, and to show the effect of his statements on the
listeners, Jenkins and Martin.    Any objection would have been
countered on those grounds.    If a limiting instruction were
requested barring the jury from considering the evidence for its
truth (i.e., that Murs said what he did, or that petitioner was in
the house with T.D.), the jury would nonetheless have been able to
evaluate it as information relating to others' understanding of
the propriety of petitioner's contact with the children.  Limiting
the jury's use of the evidence in that way would not have had a
reasonable possibility of affecting the outcome.

Petitioner raised the same concerns about parts of the
testimony of Martin.    In the state's case-in-chief, Martin
testified:

---

[2]Or. R. Evid. 404(3) states:

"Evidence of other crimes, wrongs or acts is not admissible
to prove the character of a person in order to show that
the person acted in conformity therewith. It may, however,
be admissible for other purposes, such as proof of motive,
opportunity,   intent,   preparation,   plan,   knowledge,
identity, or absence of mistake or accident."

Q:   * * * I'd like to talk about the week before
     that.  Do you remember a day when you were out
     working with the defendant in your -  in your
     shop?

A:   There was a few of us there.  We - to me, I
     related as it was - seemed like it was a few
     days prior to this.

* * * * *

Q:   All right.  And who was around?

A:   There was I, John Jenkins, [petitioner], and
     Tony Murs.

Q:   Where were the kids?

A:   They were home from school that day because of
     the weather.  They were inside watching tele-
     vision.

* * * * *

A:   [Petitioner] had asked me if he could use the
     phone or something like that.  I can't remember
     exactly what it was.  I said, "Yeah."  To me it
     seemed like quite some time had went by.   I
     asked -

* * * * *

Q:   Where did he go?

A:   Inside the house.

Q:   All right.  How long was he gone?

A:   I don't know exactly how long.  To me it felt
     like, you know, enough time for a telephone
     call.

Q:   All right.  And at some point did you go looking
     for him?

A:   Yes, I did.

Q:   Okay.  Was that at the suggestion of Tony Murs?

A:  Tony Murs never gave me, really, a suggestion. He gave me a - the way he looked at me made me go. He didn't say - actually, Tony did say, "Go check on the kids yourself."  That's right. Tony did say that.

Q:  Okay.  And did you do that?

A:  Yes, I did.

Q:  When you went into your house, what happened?

A:  I walked through our entry door and I met [petitioner] about the center of our living room coming outward.

Q:  Okay.  And who was there with him?  But -

A:  [T.D. and her brother] were in the house somewhere.  At that time I don't know where.

Pet. Ex. 3, Tr. 783-85.

Petitioner argues that defense counsel erred in allowing Martin to testify that Murs told him to "check on the kids."  That evidence was admissible for the purposes explained above: to show circumstantially Murs's own state of mind, and to show the effect of his statements on the listeners.  Again, limiting the jury's use of the evidence in that way would not have had a reasonable possibility of affecting the outcome.  In sum, the post-conviction court did not employ an unreasonable application of the law in determining that failing to object during the testimony of Jenkins and Marin did not qualify as ineffective assistance.

## CONCLUSION

Petitioner's Petition for Writ of Habeas Corpus (#1) should be granted on grounds of ineffective assistance of counsel in that

the defense counsel provided constitutionally inadequate representation when he failed to immediately object when the prosecutor personally vouched for the veracity of the state's evidence in this case.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issue and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this ___12th___ day of June, 2007.


_____
THOMAS M. COFFIN
United States Magistrate Judge